2017 BNH 006
_____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Bk. No. 15-11389-BAH |
| | Chapter 7 |
| Kathleen M. Duggan, | |
|       Debtor | |
| | |
| Edmond J. Ford, Chapter 7 Trustee, | |
|       Plaintiff | |
| | |
| v. | Adv. No. 15-1094-BAH |
| | |
| James B. Duggan and | |
| William J. Duggan | |
|       Defendants | |

| | |
|---|---|
| *Edmond J. Ford, Esq.* | *Walter C. Oney, Jr., Esq.* |
| *Richard K. McPartlin, Esq.* | *Oney Law Office* |
| *Ford & McPartlin, P.A.* | *Fitchburg, MA* |
| *Portsmouth, NH* | *Attorney for the Defendants* |
| *Attorneys for the Plaintiff* | |

### MEMORANDUM OPINION

### I. INTRODUCTION

The matter before the Court is the Complaint filed by Edmond J. Ford (the "Trustee"), Chapter 7 trustee of the estate of Kathleen M. Duggan (the "Debtor"), to sell certain real estate in Malden, Massachusetts free and clear of the interests of the co-owners pursuant to 11 U.S.C. § 363(h).  The co-owners, James B. Duggan and William J. Duggan (collectively, the "Defendants"), oppose the sale, arguing that the detriment that they would suffer far exceeds any benefit the sale of the property will yield to the bankruptcy estate.  The Court conducted a trial on February 14,

2017, at which the Trustee and James Duggan testified, and twelve exhibits were admitted into evidence by agreement. For the reasons set forth below, the Court will enter judgment in favor of the Trustee.

## II. JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and U.S. District Court for the District of New Hampshire Local Rule 77.4(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(N).

## III. FACTS

### A. Procedural History

The Debtor filed a voluntary Chapter 7 petition on August 31, 2015. On Schedule A – Real Property, the Debtor listed a one third equitable interest in a single family home located at 53 Lowell Street in Malden, Massachusetts (the "Property"). She valued that interest at $100,000.00. She also listed her equitable interest in the Property on Schedule B – Personal Property, under "[e]quitable or future interests . . . other than those listed in Schedule A." On Schedule C – Property Claimed as Exempt, the Debtor claimed an exemption in the Property in the amount of $5,764.96 pursuant to N.H. RSA § 511:2(XVIII).[1]

The Trustee was appointed on September 1, 2015. The meeting of creditors held pursuant to 11 U.S.C. § 341(a) convened and concluded on September 29, 2015. The following day, the Trustee notified the Court of the existence of assets available for distribution to creditors, and the Court set a claims bar date of December 29, 2015. On October 13, 2015, the Trustee filed the

---

[1] Since the Debtor does not reside at the Property, she only exempted the amount available to her under the wildcard exemption provided by New Hampshire law.

2

Trustee's Notice of Abandonment of the Debtor's interest in all scheduled assets other than the Property. The Debtor received a discharge on December 4, 2015.

The Trustee commenced the present adversary proceeding on December 31, 2015. After several extensions, the Defendants filed an answer on June 13, 2016. The parties filed a Joint Pre-trial Statement on February 7, 2017. On February 10, 2017, the Trustee filed a motion in limine (the "Motion in Limine") seeking to bar testimony regarding the alleged existence of an oral trust with respect to the Property. The Defendants filed a response to the Motion in Limine on February 12, 2017.

On February 14, 2017, the Court heard the Motion in Limine and conducted a trial on the merits of the Trustee's complaint. As will be discussed further below, the Court granted the Motion in Limine. At the close of evidence, the Court heard oral arguments from both parties and took the matter under advisement. At the Defendants' request, the Court afforded the parties the opportunity for additional briefing. The Defendants filed a supplemental brief on March 1, 2017. The Trustee filed a reply on March 9, 2017.

B. Stipulated Facts

The following facts are undisputed.[2] James and William Duggan are the Debtor's brothers. Their father, Channing Duggan, obtained title to the Property through a deed dated March 18, 1971. The Property consists of a single family home located in a residential neighborhood. It is over one hundred years old and is approximately 1,650 square feet in size. The Property is not used "in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power." See 11 U.S.C. § 363(h)(4). Channing Duggan

---

[2] See Joint Pre-Trial Statement, Doc. No. 45 at ¶¶ II.1-34.

3

subsequently conveyed the Property to himself and his wife, Rosemary Duggan, as tenants by the entirety on February 24, 1972. In December, 1999, Channing Duggan died, leaving Rosemary Duggan the sole owner of the Property.

On November 15, 2009, Rosemary Duggan passed away. Prior to her death, Rosemary Duggan neither executed a will or trust document, nor otherwise disposed of the Property. Thus, upon her death, the Property passed by operation of law to her heirs—the Debtor, James Duggan, and William Duggan—in equal shares as tenants in common. See Mass. Gen. Law ch. 190B, § 2-103.

Only James Duggan resides at the Property. The Debtor resides in New Hampshire, while William Duggan resides in Puerto Rico. No one has paid the real estate taxes since 2011. On July 28, 2011, the City of Malden took title to the Property on account of the unpaid taxes by executing and recording in the appropriate registry of deeds a taking pursuant to Mass. Gen. Laws ch. 60, §§ 53 and 54. As of January 6, 2017, the City of Malden is owed $37,047.18, which includes the real estate taxes for fiscal year 2017 in the amount of $1,659.02, and water and sewer charges in the amount of $429.61. A proceeding to foreclose the co-owners' equity of redemption has been filed by the City of Malden and is pending before the Massachusetts Land Court.

James Duggan has no present ability to pay the outstanding real estate taxes. The same is true of the Debtor, as her interest in the Property is the only asset of the bankruptcy estate. The Court has no information regarding William Duggan's ability to pay the outstanding real estate taxes.

The Property has an appraised value of $330,100.00 by the City of Malden.[3] The parties stipulated that they "expect that if marketed by a realtor, the market value sale price would be at

---

[3] Notwithstanding this agreed fact, the parties submitted evidence at trial showing that the tax assessed value of the Property is $403,100.00.

4

least $325,000."[4]  Other than the City of Malden's taking, the Property is not encumbered by any liens.

On the petition date, the Property was not insured.  Accordingly, Ford & McPartlin, P.A., the Trustee's counsel, expended $4,112.63 through February 3, 2017, to maintain insurance coverage on the Property.

### C. Motion in Limine

In the Joint Pre-Trial Statement, the Defendants revealed their intention to elicit testimony from James Duggan that Rosemary Duggan, despite having died intestate, intended that James Duggan would be able to stay in the Property during his lifetime and, upon his death, the remainder interest would pass to a certain minor relative.  Through the Motion in Limine, the Trustee sought to bar such testimony on the basis that it is inadmissible hearsay under Fed. R. Evid. 802, irrelevant under Fed. R. Evid. 401, and that the Defendants were judicially estopped from attacking the bankruptcy estate's interest in the Property as contrary to the representations made to the Probate Court that administered Rosemary Duggan's estate.  In their response, the Defendants asserted that the Property was subject to an oral trust under Massachusetts law such that the equitable interests in the Property never became part of the bankruptcy estate because the Debtor, James Duggan, and William Duggan hold bare legal title to the Property as oral trustees for the benefit of James Duggan and the certain minor relative.  To this end, the Defendants argued that the oral trust was either partially performed or, alternatively, fully performed as to James Duggan's interest, because

---

[4] Joint Pre-Trial Statement, Doc. No. 45 at ¶ II.26.  At trial, the Defendants asked to be relieved of this stipulation on the basis that their counsel did not read the statement carefully and believed that they were only stipulating to the Trustee's expectation of the price a sale would yield.  The Court declined to do so, citing extreme prejudice to the Trustee who, in light of the stipulation, was unprepared to litigate the value of the Property.

5

he continued to reside at the Property after Rosemary Duggan's death in a manner consistent with the life estate she allegedly intended for him.

Generally speaking, Massachusetts law recognizes the existence of oral trusts with respect to land. Nevertheless, that recognition is limited. Oral trusts in land are "not void, [but] merely unenforceable." In re Gustie, 32 B.R. 466, 471 (Bankr. D. Mass. 1983), aff'd, 36 B.R. 473 (D. Mass. 1984) (citing Ward v. Grant, 9 Mass. App. 364 (1980)). The law is clear that an "oral trust *is unenforceable by the transferor against the transferee* because the statute of frauds requires that trusts concerning land . . . must be evidenced by a written memorandum." In re Gustie, 32 B.R. at 471 (emphasis added). Indeed, oral trusts are only as valid and enforceable as if the trust had been in writing in the first place upon completion—i.e., upon the conveyance of the property from the transferee (the oral trustee) back to the original transferor (the beneficiary) in accordance with the oral trust. Bailey v. Wood, 211 Mass. 37 (1912). The rationale is that a deed from an oral trustee to the beneficiary eliminates any statute of fraud concerns, and testimonial evidence can establish the purpose behind the transfer and prove the existence of the completed oral trust. In re Gustie, 32 B.R. at 471.[5] In the interim, although an oral trustee is "not forbidden [from] perform[ing] . . . his equitable obligation" because the oral trust is not void, he cannot be compelled to do so. Id. at 471; see Twomey v. Crowley, 137 Mass. 184, 185 (1884); Hoffman v. Charlestown Five Cents Sav. Bank, 231 Mass. 324, 329 (1918).

Based on these principles, the Court concluded that even assuming that the Defendants could establish the existence of an oral trust, such evidence is not relevant to the adversary proceeding because the Trustee, as one of the three oral trustees of the trust, could not be compelled

---

[5] It is well settled that the completion of an oral trust prevents the creditors of an oral trustee from attacking the conveyance of the property to the beneficiary as a fraudulent transfer. See Ward v. Grant, 9 Mass. App. Ct. 364, 367 (1980); Ferguson v. Winchester Trust Co., 267 Mass. 397, 400 (1929).

6

to fulfill any moral obligation under the trust and, in fact, has a fiduciary duty to the bankruptcy estate's creditors not to honor the moral obligation. In other words, the alleged oral trust will never be completed because the Trustee will not convey his title interest in accordance with the alleged trust's terms. In so ruling, the Court rejected the assertion that James Duggan's residence at the Property was meaningful performance under the oral trust because it did not result in a conveyance of the title interest and could not be said to have "completed" anything.[6] Accordingly, the Court granted the Motion in Limine and barred any evidence of Rosemary Duggan's undocumented intent with respect to the Property as irrelevant under Fed. R. Evid. 401.

D. Trial Record

At trial, the Trustee described the Property as a "reasonable little house in a working class neighborhood" in Malden, Massachusetts with no ability to generate rent or income. He explained that partitioning the Property is impracticable because the house is a single family dwelling and takes up too much space on the lot. The Trustee testified that there is no market for the bankruptcy estate's one third interest in the Property because it would be virtually impossible to sell the Property subject to the rights of the co-owners.

Based upon the stipulated minimum sale price of $325,000.00, the Trustee estimates the bankruptcy estate, James Duggan, and William Duggan would each receive approximately $88,990.00, calculating the cost of the sale as follows:

| | |
|---|---:|
| Sale Price: | $325,000.00 |
| Realtor Commission (6.0%): | $19,500.00 |
| Transfer Stamps ($4.56/$1,000): | $1,482.00 |
| Real Estate Taxes: | - $37,047.00 |
| Total Net to Sellers: | $266,971.00 |
| | ÷ 3 |

---

[6] The Court also expressed doubt that partial performance could be sufficient to except an oral trust from the statute of frauds under Massachusetts law.

7

      **Net to Each Seller:**        **$88,990.00**

Emphasizing the benefit of such a sale to the bankruptcy estate, the Trustee testified that the estate's share will be more than enough to pay all administrative expenses and unsecured creditors in full, and will yield a substantial surplus to the Debtor:

    Bankruptcy Estate's Share:    $88,990.00
    Capital Gains Tax:    $6,935.00
    Debtor's Exemption:    $5,765.00
    Attorney's Fees:    $30,000.00
    Trustee's Fee:    $8,029.00
    Other Administrative Fees:    - $1,500.00
    **Net Available to Creditors:**    **$36,762.00**
    Total Claims Filed:    - $18,313.00
    **Surplus:**    **$18,449.00**

As will be discussed in greater detail below, the Defendants assert several theories challenging the Trustee's calculus on the basis that the administrative cost to the bankruptcy estate to complete a sale so far exceeds any possible benefit to the estate making a sale impractical. For example, James Duggan testified that the Property suffers from substantial deferred maintenance and requires, *inter alia*, structural repairs, a new roof, remediation of an oil tank leak, and plumbing and electrical upgrades. After the Court ruled that it would not consider such testimony as evidence of value contrary to the parties' stipulation as to the sale price that would be obtained through marketing, the Defendants suggested that it was instead evidence of necessary expenditures to render the Property salable. Despite this theoretical pivot, the Defendants did not establish the existence of a material issue that would render the Property completely unsalable without prior remediation. Accordingly, the Court finds that James Duggan's testimony regarding the condition of the Property is merely consistent with the difference between the stipulated sale price of $325,000.00 and the Property's tax assessed value of $403,100.00.[7]

---

[7] See Ex. 7.

At trial, James Duggan testified at length about the impact a sale of the Property would have on him. His testimony evidenced his strong emotional attachment to the Property. He explained that the Property has been in his family for one hundred years and that, aside from a period spent in Puerto Rico living with his brother, he has lived there his whole life. He returned to the Property to take care of Rosemary Duggan after his father died and has remained ever since. He testified that it is important to him that the Property remain in the family.

James Duggan further testified that he is terrified by the prospect of losing the Property and being rendered homeless. He believes that if that were to happen, he would require a period of hospitalization. In support, James Duggan explained that he has been diagnosed as bipolar and suffers from depression (for which he is being treated with medication), Hepatitis C, and hemochromatosis.

James Duggan's financial situation is unenviable. He testified that he is currently unemployed, received income of less than $5,000.00 in 2016, and receives public health insurance and food stamps. The household, however, is supplemented by social security disability payments received by James Duggan's live-in girlfriend. Therefore, he testified that he believes that he could pay for any emergency repairs to the Property that arise,[8] but could not afford to pay monthly rent for an apartment.

As stated above, James Duggan has no present ability to pay the outstanding real estate taxes owed to the City of Malden. Nevertheless, he insisted at trial that the real estate taxes were "resolved." By way of explanation, James Duggan testified that he spoke to the Mayor of Malden the morning of the trial, and asserted that they had come to an agreement to cure the arrearage. He

---

[8] This statement stands in stark contrast to the lengthy list of repairs he suggested were a precondition to a sale.

9

conceded, however, the agreement was not in writing and was dependent on the outcome of this trial. He did not disclose either the terms of the agreement or his ability to perform it.

## IV. POSITIONS OF THE PARTIES

For clarity, the Court will summarize the Defendants' arguments before those of the Trustee, even though the Trustee is the moving party with the burden of proof.

### A. The Defendants

The Defendants dispute that a sale of the Property would be even remotely as beneficial to the bankruptcy estate as the Trustee asserts, advancing two theories that render the administrative cost to the bankruptcy estate substantially higher than estimated by the Trustee. First, the Defendants contend that the Trustee cannot charge the costs of the sale to co-owners who do not consent to the sale of the Property. While acknowledging that this position is contrary to Dahar v. Jackson (In re Jackson), No. 01-13153-JMD, 2003 WL 21991629, at *1 (Bankr. D.N.H. Aug. 6, 2003), the Defendants assert that case cited no authority for the proposition that real estate tax liens, brokers' commissions, and real estate transfer taxes were clearly among the costs payable from the gross proceeds of the sale. Relying on 11 U.S.C. § 363(j), which prohibits the Trustee from charging his compensation against the gross sale proceeds, and Stine v. Diamond (In re Flynn), 418 F.3d 1005 (9th Cir. 2005), the Defendants urge the Court to adopt a "fairer rule" that provides that "the costs of performing the trustee's duties under § 704(a) are not chargeable against the dispossessed co-owners."[9]

---

[9] See Supplemental Brief RE Allocation of Costs and Expenses, Doc. No. 51 at 4.

Second, the Defendants construe Mass. Gen. Laws ch. 59, § 12D as requiring the Trustee to pay the outstanding real estate taxes before he can seek contribution from the co-owners. In other words, the Defendants argue that the Trustee cannot simply execute a setoff of the real estate taxes against the gross sale proceeds. Moreover, the Defendants posit that a civil action for contribution after the Trustee's payment of the real estate taxes would be a proceeding in which this Court would not have authority to enter a final judgment under Stern v. Marshall, 564 U.S. 462 (2010). Thus, the Trustee would also incur legal fees in his effort to obtain contribution from the Defendants, increasing the administrative cost to the bankruptcy estate.

In sum, the Defendants contend that the following calculation more accurately reflects the benefit, or lack thereof, to the bankruptcy estate arising from the sale of the Property:

| | |
|---|---:|
| Sale Price: | $325,000.00 |
| | $\div 3$ |
| **Net to Each Seller:** | **$108,333.00** |
| | |
| Bankruptcy Estate's Share: | $108,333.00 |
| Realtor Commission (6.0%): | $19,500.00 |
| Transfer Stamps ($4.56/$1,000): | $1,482.00 |
| Real Estate Taxes: | - $37,047.00 |
| **Net Sale Proceeds to Bankruptcy Estate:** | **$50,304.00** |
| Capital Gains Tax: | $6,935.00 |
| Debtor's Exemption: | $5,765.00 |
| Attorney's Fees: | $30,000.00 |
| Trustee's Fee: | $8,029.00 |
| Property Insurance Reimbursement: | $4,113.00 |
| Other Administrative Fees: | - $1,500.00 |
| **Net Available to Creditors:** | **-$6,038.00** |

Notably, this calculation, though already resulting in a negative number, does not factor in the cost of seeking contribution from the Defendants in a separate civil action.[10] Therefore, the Defendants assert that the sale of the Property would not benefit the bankruptcy estate.

---

[10] In fairness, the calculation also does not factor in the ultimate benefit to the bankruptcy estate of seeking contribution from the co-owners for their share of the real estate taxes. It is apparent, however, that the Defendants

11

On the other hand, the Defendants argue that a sale of the Property would be substantially detrimental to James Duggan. They assert a sale of the Property will leave him homeless, as he has inadequate income to pay monthly rent for an apartment. Additionally, due to James Duggan's deep emotional ties to his family home and relatively fragile state, the Defendants contend that the loss of the Property will significantly damage his mental health, likely resulting in his hospitalization. These injuries, the Defendants argue, outweigh the benefit arising from the payment of approximately $18,000.00 in claims against the bankruptcy estate.

### B. The Trustee

The Trustee asserts that this is a straightforward case under 11 U.S.C. § 363(h). Here, the bankruptcy estate's sole asset is an undivided one third interest in the Property that, as a practical matter, cannot be partitioned or sold. In contrast, a sale of the Property as a whole will result in all creditors being paid in full—a significant benefit to the estate.

The Trustee argues that the benefit of a sale of the Property to the bankruptcy estate substantially outweighs any detriment to the co-owners. From the outset, he notes that William Duggan and James Duggan will each receive approximately $89,000.00 from the sale proceeds, and the Debtor will receive a surplus of approximately $18,000.00 after payment of all claims. To the extent that James Duggan will suffer the loss of his home, the Trustee contends that this detriment is likely to occur in any event, in light of the City of Malden's tax taking and initiation of civil proceedings to foreclose the equity of redemption, as well as James Duggan's inability to cure the arrearage. In addition, the Trustee argues that there is no evidence in the record articulating any detriment to William Duggan.

---

take the position that the cost of recovering $24,698.00 (two thirds of the outstanding real estate taxes) from the Defendants will consume any recovery.

In response to the Defendants' post-trial briefing, the Trustee cites a plethora of authority to support the contention that realtor commissions and transfer taxes are appropriately charged against the gross sale proceeds pursuant to 11 U.S.C. § 363(j). Moreover, to the extent that the Defendants assert that the Trustee must first pay the real estate taxes before seeking contribution from the co-owners, the Trustee argues that they fail to acknowledge that pursuant to Mass. Gen. Laws ch. 60, § 37 real estate taxes are a lien on the Property that the Trustee must satisfy prior to any other distribution. The Trustee also asserts that the Defendants' argument under Mass. Gen. Laws ch. 59, § 12D is incorrect and untimely. Finally, the Trustee notes that the Defendants consented to the issuance of final orders by this Court so there is no impediment under Stern v. Marshall, 564 U.S. 462 (2010).[11]

## V. DISCUSSION

### A. Applicable Law

Section 363(h) of the Bankruptcy Code permits a trustee to sell both the bankruptcy estate's interest and a co-owner's interest in property if four conditions are satisfied. Specifically, that section provides:

> Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—
>
> > (1) partition in kind of such property among the estate and such co-owners is impracticable;
> >
> > (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

---

[11] See Answer, Doc. No. 25 at ¶ 10.

13

> (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
>
> (4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

11 U.S.C. § 363(h). In the present case, the parties have stipulated that 11 U.S.C. § 363(h)(4) is satisfied. Moreover, the Defendants do not dispute the Trustee's assertions that partition of the Property is impracticable given that it is a single family home, and that there is no market for the bankruptcy estate's one third undivided interest. Therefore, the sole issue in this case is whether the benefit of a sale of the Property to the bankruptcy estate outweighs the resulting detriment to the co-owners.

> Notably, the balancing of these considerations requires the application of a shifting burden:
>
> Although the Plaintiff [Trustee] bears the ultimate burden of proof on this issue, the Plaintiff's initial burden is only to show that sale of the property free of the Defendant's interest would produce a benefit to the estate: that the estate's share of the net proceeds would exceed existing liens on the Debtor's interest in the property. If the Defendant then shows that such a sale would produce a detriment to him, the Trustee must show that the benefit to the estate is greater than the detriment to the Defendant.

Gray v. Burke (In re Coletta Bros. of N. Quincy, Inc.), 172 B.R. 159, 165 (Bankr. D. Mass. 1994). As part and parcel of this evaluation, "the Court must consider the economic and emotional detriment which the co-owner would face in being evicted." Neylon v. Addario (In re Addario), 53 B.R. 335, 338 (Bankr. D. Mass. 1985). "Not surprisingly, the balancing of the detriment to a co-owner versus the benefit to the estate is a fact sensitive analysis that is decided on a case by case basis." In re Jackson, 2003 WL 21991629, at *4.

14

B. <u>Determination of the Benefit to the Estate</u>

In the present case, the Trustee avers that a sale of the Property will result in the payment of all claims against the bankruptcy estate, an assertion which he supported with an outline of the estimated costs. As explained above, the Defendants challenge the Trustee's ability to charge either the costs of the sale or the real estate taxes against their interests. For the reasons set forth below, the Court finds that both the costs of the sale and the real estate taxes must be deducted from the gross sale proceeds before distribution to the Defendants. As a result, the Court accepts the Trustee's estimates and concludes that a sale of the Property will yield sufficient funds to pay all claims in full, with a surplus to the Debtor.

1. Charging the Costs of the Sale Against the Gross Sale Proceeds

In <u>In re Jackson</u>, Judge Deasy concluded that 11 U.S.C. § 363(j) was "clear and unambiguous in describing the federal scheme for determination of the amount of the net proceeds." 2003 WL 21991629, at *7. Section 363(j) of the Code provides:

> After the sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, *less the costs and expenses*, not including any compensation of the trustee, *of such sale*, according to the interests of such spouse or co-owners, and of the estate.

11 U.S.C. § 363(j) (emphasis added). Accordingly, he held that "the costs of the sale, including, but not limited to the broker's commission, recording fees, real estate transfer tax, nominal legal expenses . . . are chargeable against the gross sale proceeds before they are divided between the estate and [co-owner]." <u>In re Jackson</u>, 2003 WL 21991629, at *7.

The Defendants assert that this conclusion lacks support because "costs and expenses" are undefined terms in 11 U.S.C. § 363(j).[12] Seizing on this perceived ambiguity, the Defendants advance a "fairer rule," arguing that *all* of the costs of performing a trustee's duties under 11 U.S.C. § 704, *including* the costs of marketing and liquidating property, are chargeable only against the Debtor's estate, and *none* are chargeable against the dispossessed co-owners. In support, the Defendants cite In re Flynn, a decision from the United States Court of Appeals for the Ninth Circuit holding that the trustee's attorney fees incurred in preserving and disposing of property could not be deducted from gross sale proceeds prior to division. 418 F.3d at 1007-08. Ultimately, the Court finds the Defendants' argument patently flawed because the construction of 11 U.S.C. § 363(j) they advance violates several well-established canons of statutory construction.

The Supreme Court of the United States instructs that "[w]e do not start from the premise that [the statutory] language is imprecise." United States v. LaBonte, 520 U.S. 751, 757 (1997). Indeed, "we look first to its language . . . giving the 'words used' their 'ordinary meaning.'" Moskal v. United States, 498 U.S. 103, 108 (1990) (internal citations omitted). Moreover, "[a]ll words and provisions of a statute are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous." United States v. Ven–Fuel, Inc., 758 F.2d 741, 751–52 (1st Cir. 1985).

The first problem is that the relevant phrase is not "costs and expenses," but "costs and expenses . . . *of such sale*." 11 U.S.C. § 363(j) (emphasis added). As recognized by Judge Deasy, the ordinary meaning of this phrase immediately brings to mind a certain class of expenses that naturally arise from the sale of property. Unlike his interpretation, however, the Defendants'

---

[12] The Defendants also note the phrase "compensation of the trustee" is similarly undefined, but it is unclear what relevance that has to their interpretation of 11 U.S.C. § 363(j). The Court does not understand the Defendants to be arguing that costs such as a broker's commission and real estate transfer taxes are "compensation of the trustee."

16

reading ignores the ordinary meaning of those words and assumes the statute is ambiguous simply because "costs and expenses" are not expressly defined. Nevertheless, the fatal flaw is that the Defendants' desired rule necessarily renders the phrase "costs and expenses . . . of such sale" superfluous because they seek to characterize *all* costs and expenses of a nonconsensual sale under 11 U.S.C. § 363(h) as general administrative expenses that are not chargeable against the interests of the co-owners. The Defendants have offered no authority to support such a construction and nor could they given that it effectively requires a statutory phrase to be ignored. Notably, <u>In re Flynn</u>, the sole case the Defendants cited, merely stands for the unremarkable proposition that a trustee's attorney's fees incurred in liquidating property are not "costs and expenses . . . of such sale." <u>In re Flynn</u>, 418 F.3d at 1007-08. Accordingly, the Court agrees with <u>In re Jackson</u> and finds that the broker's commission, recording fees, and real estate transfer taxes, are "costs and expenses . . . of such sale" chargeable against the gross sale proceeds pursuant to 11 U.S.C. § 363(j).

2. Payment of Real Estate Taxes Prior to Distribution

The Defendants argue that the Trustee cannot pay the outstanding real estate taxes from the undivided sale proceeds. They rely on Mass. Gen. Laws ch. 59, § 12D, which provides:

> The undivided real estate of a deceased person may be assessed to his heirs or devisees, without designating any of them by name, until the names of such heirs or devisees appear in the probate court records in the county in which said real estate lies; and each heir or devisee shall be liable for the whole of such tax, and when paid by him he may recover of the other heirs or devisees their respective proportions thereof.

Mass. Gen. Laws ch. 59, § 12D. The Defendants contend that the second clause of this section creates a prerequisite to the right of one heir to seek contribution from another: payment of the taxes. Accordingly, they assert that until the Trustee satisfies the entire amount of the real estate

17

taxes from the estate's share of the net sale proceeds, he cannot seek contribution from them. The Defendants further posit that enforcing any right to contribution requires a civil action, filed in an appropriate court with jurisdiction and authority to decide the matter.

The Defendants misapprehend the issue. Contribution is a question of *in personam* liability among co-owners, which is irrelevant here because real estate taxes under Massachusetts law are a lien upon the land. See Mass. Gen. Laws Ann. ch. 60, § 37. As the holder of *in rem* claim, the City of Malden has priority over the equity interests of the co-owners. Therefore, the real estate taxes must be paid in full prior to any distribution under 11 U.S.C. § 363(j).

C. Weighing the Benefit to the Estate Against the Detriment to the Co-Owners

As explained above, the benefit to the bankruptcy estate from a sale of the Property will be that all claims are paid in full—the best result possible for the estate.

On the other side of the equation, although there is no evidence William Duggan will suffer any harm from a sale of the Property, James Duggan credibly testified that a sale will be significantly detrimental to him. James Duggan will lose his home and be forced to find alternative housing, which may prove difficult due to his limited financial resources. The loss of his family home will also be emotionally difficult for him. Moreover, the Court is mindful that the impact of the loss will likely be exacerbated by James Duggan's existing health conditions. Nevertheless, the Court finds that there are other factors that must be considered in evaluating the detriment to James Duggan.

First and foremost, based on the record before the Court, a loss of the Property appears inevitable regardless of the Trustee's desired sale. The City of Malden has taken title to the Property on account of the unpaid real estate taxes, and a proceeding to foreclose the equity of

redemption is now pending in the Massachusetts Land Court. By his own admission, James Duggan lacks the present ability to pay the outstanding balance of $37,047.18 owed to the City of Malden, and there is nothing in the record to suggest William Duggan can, or will, do so either. The Court is mindful that James Duggan insists that the tax issue will be "resolved" based on his conversation with the Mayor of Malden, but finds his contention ill-defined and speculative. Indeed, although James Duggan testified that he had "come to an agreement" with Malden's mayor, he conceded that there is currently no written agreement, and provided none of its terms, leaving the Court unable to gauge its terms or its enforceability. At best, his testimony suggests the City of Malden is or may be willing to negotiate a payment plan with him if he were to prevail in this adversary proceeding. Even if that were true, however, the undisputed evidence is that he presently lacks the financial capacity to make such payments, and there is no evidence that is likely to change in the near future. Accordingly, because the Court finds it likely that the City of Malden's tax taking will be completed and the equity of redemption foreclosed, the detriment to James Duggan arising from the Trustee's sale, though not insubstantial, weighs less heavily against the benefit to the bankruptcy estate.

      Further mitigating the detriment to James Duggan occasioned by a sale of the Property is the fact that the estimated sale price (if attained) will yield net proceeds to each Defendant in the amount of $88,900.00, as well as a surplus of $18,449.00 to the Debtor. This is a significant amount of money for his one third interest in the Property, particularly in light of James Duggan's financial condition. While his estimated $88,900.00 share may not be enough to purchase a new home in Malden, Massachusetts, it nonetheless appears to be a sufficient sum with which to find alternative housing. Therefore, though James Duggan will be displaced, he will receive the full value of his interest in cash and have the capacity to make new living arrangements.

Taking all these considerations into account, the Court finds that the benefit of a sale of the Property to the bankruptcy estate outweighs the detriment to the co-owners.[13]

## VI. CONCLUSION

For the reasons stated, the Court finds that the Trustee has sustained his burden under 11 U.S.C. § 363(h) and is entitled to sell the Property free and clear of the ownership interests of the Defendants.  Accordingly, the Court will enter judgment in favor of the Trustee.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

ENTERED at Manchester, New Hampshire.


Dated: May 12, 2017                     /s/ Bruce A. Harwood
                                        Bruce A. Harwood
                                        Bankruptcy Judge

---

[13] The Court notes, however, that this conclusion is based on the evidence now before it, and that the economic reality of a sale of the Property may prove to be quite different after the Property has been marketed.